**In the United States District Court
for the District of Kansas**

---

**Consolidated Cases**

---

Case Nos. 5:20-cv-04037-TC-JPO & 5:20-cv-04074-TC-JPO

WENDY HILLS AND BRENT HILLS,

*Plaintiffs*

v.

GERARD ARENSDORF,

*Defendant*

---

**MEMORANDUM AND ORDER**

In separate actions that are now consolidated, Wendy Hills and her brother, Brent Hills, sued Defendant Gerard Arensdorf for professional negligence and for violations of the Kansas Consumer Protection Act ("KCPA"), K.S.A. § 50-6,142. Doc. 21.[1] Arensdorf moves to dismiss both claims for failure to state a claim for which relief may be granted. Docs. 26 & 27. For the following reasons, Defendant's motion is granted.

**I**

**A**

Defendant moves to dismiss Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. A viable complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" from the named defendant. Fed. R. Civ. P. 8(a); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

---

[1] These matters were filed separately as Case Nos. 20-4037 and 20-4074. They were subsequently consolidated, with Case No. 20-4037 as the lead case. Doc. 10. Unless otherwise noted, all citations to the docket entries are to the lead case.

1

The Tenth Circuit has summarized two "working principles" that underlie this standard. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, the Court ignores legal conclusions, labels, and any formulaic recitation of the elements. *Iqbal*, 556 U.S. at 678–79; *Kan. Penn Gaming*, 656 F.3d at 1214. Second, the Court accepts as true all remaining allegations and logical inferences and asks whether the claimant has alleged facts that make her claim plausible. *Kan. Penn Gaming*, 656 F.3d at 1214.

A claim need not be probable to be considered plausible. *Iqbal*, 556 U.S. at 678. But the facts viewed in the light most favorable to claimant must move the claim from merely conceivable to actually plausible. *Id.* at 678–80. The "mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis original).

Plausibility, like most things in life, depends on context. The requisite showing depends on the claims alleged, and the inquiry usually starts with determining what the plaintiff must prove at trial. *See Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). The nature and complexity of the claim(s) define what plaintiffs must plead. *Cf. Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008) (comparing the factual allegations required to show a plausible personal injury claim versus a plausible constitutional violation).

**B**

**1.** Douglas Hills ("Douglas") died intestate in July 2018. This is a dispute between Douglas's children from his first marriage, Plaintiffs Wendy and Brent, and Gerald Arensdorf. Doc. 21 at ¶ 8. They allege that Arensdorf, a Certified Public Accountant, prepared a document transferring some of Douglas's property into a trust. Further, the Complaint alleges that Douglas and Arensdorf had a "longstanding confidential and trusting" relationship in which Douglas was Arensdorf's client. *Id.* at ¶¶ 2, 5, 39, 41. And while Arensdorf is not an attorney, Plaintiffs contend he engaged in the unauthorized practice of law when he prepared and submitted the aforementioned trust document to Douglas. *Id.* at ¶¶ 2, 72.

Douglas married Junelle Hills in 1985, and they remained married until his death. Doc. 21 at ¶¶ 7–11. Before their marriage, Douglas and Junelle executed a prenuptial agreement, which stated that all of Douglas's property would pass to his heirs "under any Will" and "to the same extent as [it] would have done had said marriage not taken place." *Id.* at ¶ 23; Doc. 21-2 at 2.

A year into the marriage, Douglas signed a trust instrument, *see* Doc. 21-1, naming Junelle Hills as one of three co-trustees. Doc. 21 at ¶ 13. The instrument named Junelle and Plaintiffs as the Trust beneficiaries. *Id.* at ¶ 14. Until July 2018, Douglas had never funded the Trust. *Id.* at ¶ 15.

In June 2018, Douglas's health declined. He suffered a heart attack on June 16 and was soon after diagnosed with lung and brain cancers. Doc. 21 at ¶¶ 16–19. On July 3, 2018, doctors informed Douglas his condition was terminal. The Complaint alleges that on or around that same day, Junelle provided Arensdorf a copy of the Trust agreement for the first time. *Id.* at ¶ 32.

**2.** Several significant events occurred on July 6, 2018. First, Junelle asked Douglas, while he was home recovering from surgery and radiation therapy, whether he wanted to keep the 1985 prenuptial agreement in place. Doc. 21 at ¶ 25. "In the presence of [Junelle, Arensdorf, and Wendy,] Douglas replied, 'Yes. I still want the pre-nup in place.'" *Id.* at ¶ 26.

Second, Arensdorf had a conversation with Wendy. In that conversation, Arensdorf informed Wendy that Junelle was pushing Arensdorf to prepare the Assignment of Douglas's property interests quickly, that Arensdorf did not speak with Douglas about the dispositive effect of the proposed assignment, and that Arensdorf had not reviewed nor did he understand the dispositive effect the transfer would have on the Trust. Doc. 21 at ¶ 32. Wendy informed Arensdorf that her father "repeatedly" stated over the years he intended Wendy and Brent to have the farm assets being discussed. *Id.* at ¶ 33. The Complaint states that Douglas told Plaintiffs many times that Junelle would not "get anything" from the farm assets after his death. *Id.* at ¶ 45.

Third, Douglas transferred a significant amount of property—purportedly worth $10 million—into his Trust by way of a single-page

3

Assignment. Doc. 27-1.[2] That Assignment states that Douglas "gives, assigns, transfers" his entire "right, title, and interest" in and to 3-H's Enterprises (the interests at issue) to the Trust and was signed by Douglas on July 6, 2018. Doc. 27-1.

Plaintiffs assert the circumstances of the document's execution were suspicious. Specifically, Plaintiffs describe the situation as follows: "[T]welve days before his death, while in frail health, at the behest and demand of Junelle Hills, and under highly suspicious circumstances, Douglas W. Hills purported to transfer the Hills' family farm property and other property . . . from his individual ownership into the ownership of the Purported Trust." Doc. 21 at ¶ 28. The suspicious circumstances include the fact that Douglas never instructed Arensdorf to prepare the Assignment document, Arensdorf did not ask Douglas what his dispositive wishes were, and Arensdorf did not advise Douglas that he should seek the advice of an attorney regarding the transfer document and/or Douglas's estate planning needs. *Id.* at ¶¶ 30–31, 34–38. Despite all that, Arensdorf presented Douglas with the Assignment, Doc. 27-1, for his signature. *Id.* at ¶ 28. Based on Douglas's longstanding "confidential and trusting relationship" with Arensdorf, Douglas did not question the dispositive effect of the document and executed that Assignment.

That property transfer, according to Plaintiffs, was in error. Specifically, Plaintiffs claim that neither Arensdorf nor Douglas understood the net effect of the property assignments that Arensdorf prepared and Douglas signed. Doc. 21 at ¶ 42. What it did, they allege, reversed Douglas's longstanding estate planning desires by making Junelle a beneficiary potentially eligible to receive millions of dollars in distributions from assets Douglas had intentionally kept separate from her throughout their marriage. *Id.*

**3.** After Douglas's death, Wendy was appointed special administrator of Douglas's Estate. Doc. 21 at ¶ 62. Wendy, on behalf of Douglas's Estate and in her individually capacity, sued Junelle and the Trust

---

[2] This Assignment is attached to Arensdorf's Memorandum in Support for his Motion to Dismiss. Doc. 27-1. Because the Assignment and outside documents (the Trust, Doc. 21-1; the prenuptial agreement, Doc. 21-2; the prior state suit against Junelle, Doc. 27-3; the prior federal suit against Junelle, Doc. 27-4) cited in this Order were referenced in the Second Amended Complaint, are central to Plaintiffs' claims, and the parties do not challenge their authenticity, they may be considered at the Rule 12 stage without converting Arensdorf's Motion into one for summary judgment. *Lincoln v. Maketa*, 880 F.3d 533, 537 (10th Cir. 2018). In fact, counsel for all parties agreed at the May 25, 2021, hearing these documents could and should be considered without the need to convert this matter to one for summary judgment.

trustees in both state and federal court, asserting several claims arising from the July 6 property transfer. *Id.* at ¶ 47. In the state case, Wendy alleged five claims: (i) undue influence and unjust enrichment, (ii) tortious interference with inheritance, (iii)–(iv) breach of trust, and (v) declaratory judgment to find the trust invalid. Doc. 21 at ¶ 47; *see also* Doc. 27-3. In the federal case, Wendy alleged three counts of breach of trust and one of undue influence and/or tortious interference with inheritance. Doc. 21 at ¶ 47; *see also* Doc. 27-4. Arensdorf was not party to the suits. Doc. 21 at ¶ 48.

Ultimately, the parties settled those suits and, as part of the settlement, agreed the Trust transfers were void. Doc. 21 at ¶ 63. While Wendy also released Junelle and her agents from future suits, Wendy and the Estate "incurred significant legal fees" and had to pay "extensive consideration" to Junelle throughout that process as part of the settlement agreement. *Id.* This suit seeks recovery of those amounts.

### C

Plaintiffs have filed these now-consolidated actions against Arensdorf in his capacity as Douglas's agent. Doc. 21 at ¶ 52. They contend that when Arensdorf drafted the Assignment pursuant to Junelle's request and gave it to Douglas to sign, Arensdorf was simultaneously acting as an agent for both Junelle and Douglas. *Id.* at ¶¶ 39–41.

Plaintiffs make two claims for relief. In one, they contend that Arensdorf committed legal malpractice when he prepared and presented the Assignment to Douglas, the execution of which caused the Trustees to claim title to assets which Douglas intended Plaintiffs to own outright after his death. Doc. 21 at ¶ 61. In the other, Plaintiffs assert that Arensdorf violated the KCPA by providing unlicensed legal work (estate planning and other legal services) and that this conduct aggrieved them as Douglas's heirs. *Id.* at 8–12.

Defendant moves to dismiss both claims. Doc. 27. In addition to the arguments contained in their respective pleadings, the parties also presented oral arguments during a hearing on May 25, 2021. Doc. 57.

## II

The facts pled fail to show that Plaintiffs have a plausible entitlement to relief against Arensdorf under Kansas law.[3] As a result, Arensdorf's motion to dismiss both claims for failure to state a claim is granted.

### A

Plaintiffs assert a legal malpractice claim against Arensdorf. In essence, they allege that not only did Arensdorf engage in the unauthorized practice of law by advising Douglas but also that he did a substandard job. Doc. 21 at ¶¶ 60, 65–67. Indeed, were Arensdorf an attorney, the facts suggest that he would have violated several provisions within the Kansas Rules of Professional Conduct, including KPRC 1.1 (competence) and KPRC 1.7 (loyalty). But Arensdorf correctly argues that any professional obligations were owed to Douglas, not Plaintiffs. In response, Plaintiffs argue that they are entitled to assert this claim under Kansas law because Douglas intended for them to inherit the assets that were transferred through the work Arensdorf performed. Docs. 27 at 13–16; 31 at 12–16.

There are four elements to a legal malpractice claim under Kansas law. To state such a claim, Plaintiffs must establish that (i) the attorney owed a duty to exercise ordinary skill and knowledge, (ii) breached that duty, (iii) that breach caused the resulting injury, and (iv) actual loss resulted. *Bergstrom v. Noah*, 974 P.2d 531, 553 (Kan. 1999). Arensdorf argues dismissal is required because he owed Plaintiffs no duty. Doc. 27 at 13.

Duty in tort law parlance is "a legal obligation that is owed or due to another and that needs to be satisfied; that which one is bound to do, and for which somebody else has a corresponding right." *Duty*, Black's Law Dictionary (11th ed. 2019). Whether a duty exists is a

---

[3] At the hearing, the parties agreed that Kansas law applies to this claim. And they further agreed that the question of liability in this case is a matter of first impression under Kansas law. In diversity jurisdiction cases, federal courts must resolve state law questions by following the holdings of the state's highest court. *United States v. Turley*, 878 F.3d 953, 957 (10th Cir. 2017) (citing *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)). Where there is no definitive pronouncement from the state's highest court, such as here, federal courts must predict how that court would rule and may use lower state court decisions to do so. *Id.*

question of law for courts to decide. *Hammon v. San Lo Leyte VFW Post #7515*, 466 P.3d 886, 890 (Kan. 2020).

Generally speaking, attorneys are not liable for negligence to non-clients because their "paramount and exclusive duty is to [their] client." *Nelson v. Miller*, 607 P.2d 438, 450 (Kan. 1980). Nonetheless, Kansas law recognizes that attorneys might owe a duty to certain third parties in certain, limited circumstances.[4] *See Johnson v. Wiegers*, 46 P.3d 563, 567–68 (Kan. Ct. App. 2002); *see also OMI Holdings, Inc. v. Howell*, 918 P.2d 1274, 1287 (Kan. 1996) (recognizing the general rule that attorneys can be liable for negligence to a contract's third-party beneficiary); *see also* 4 Ronald E. Mallen, *Legal Malpractice: Standing to Sue* § 36:10 (2021 ed.) (noting that attorneys can be liable for negligence "to the intended beneficiaries, usually designated heirs, but not to incidental beneficiaries or other heirs"); *cf. O'Keefe v. Darnell*, 192 F. Supp. 2d 1351, 1358 (M.D. Fla. 2002) (applying Kansas law and holding plaintiff heirs had standing to sue decedent's attorney for malpractice in will preparation because the heirs were intended beneficiaries to the trust and estate plan).

In *Wiegers*, the Kansas Court of Appeals canvassed the state of Kansas law and reduced the rule of liability into a three-part test. *Wiegers*, 46 P.3d at 567–68; *see also* 1 Linda D. Elrod, Kan. Law & Prac., *Family Law: Liability to Third Parties* § 1:31 (2021 ed.). That test is as follows: (i) If the attorney's client and the third-party are adversaries, no duty arises; (ii) if the attorney and client never intended for the attorney's work to benefit the third party, no duty arises; and (iii) if it is possible to conclude that the attorney and client intended for the attorney's work to benefit the third party, then the reviewing court must apply a six-factor test from *Pizel v. Zuspann*, 795 P.2d 42 (Kan. 1990),

---

[4] Both Plaintiffs and Arensdorf assume this test applies not only to attorneys licensed to practice law in Kansas but also to those who—like Arensdorf—are not attorneys and are instead engaging in the unauthorized practice of law. Perceiving no contrary authority to challenge that assumption, it will be accepted for purposes of resolving Arensdorf's motion to dismiss.

*opinion modified on denial of reh'g*, 803 P.2d 205 (Kan. 1990),[5] to determine whether a duty arose. *See Wiegers*, 46 P.2d at 568.

**1.** Plaintiffs' malpractice claim fails at the first step. Relative to the Assignment's execution, Douglas and Plaintiffs' interests were directly adverse. Whereas Plaintiffs intended for Douglas to hold the property and allow it to be distributed to them under Kansas's intestacy laws, the Assignment transferred title in that property to the Trust. Doc. 21 at ¶¶ 12, 14, 28, 61. That Assignment, which Douglas signed, directly contradicted both Wendy and Brent's expectations. Indeed, as Wendy told Arensdorf on the day Douglas signed the document, "[H]er father had repeatedly stated over the years that he intended Wendy and her brother Brent Hills to have the farm assets." *Id.* at ¶ 33. That adversarial relationship precludes Wendy and Brent's claim against Arensdorf. *See Wiegers*, 46 P.3d at 567 (holding that decedent's husband and daughter sufficiently adverse in an estate dispute and daughter's lawyer owed no duty to decedent's husband); *see also Bank IV Wichita, Nat. Ass'n v. Arn, Mullins, Unruh, Kuhn & Wilson*, 827 P.2d 758, 768 (1992) (holding that a borrower and lender are sufficiently adverse in loan transaction that lender's attorney owed no duty to borrower plaintiff).

Plaintiffs' contrary arguments miss the mark. They argue that "they were not in an adversarial relationship with their father because their father intended to benefit Plaintiffs with his farming interests." Doc. 31 at 13. There may have been no animosity between Douglas and his children. But personal animosity or prior intent is not the question. Rather, the focus is on the transaction at issue. *See Wiegers*, 46 P.3d at 567 (noting the "renewed [] focus on the original intention of the defendant and client regarding [a lawyer's duty to third parties arising from] a given transaction"). There is no doubt that the Assignment for which Arensdorf allegedly provided legal services was—as evidenced

---

[5] The Kansas Supreme Court modified language from the first opinion, 795 P.2d 42, to more accurately reflect a lawyer's duty to a client after the attorney-client relationship terminates and clarified which action actually caused the plaintiff's injury. *See Pizel*, 803 P.2d 205 (Kan. 1990). It was the attorney's failure to adequately advise the decedent on effecting his trust plan—not the attorney's failure to assure the decedent's intent to pass the land to his nephews was eventually realized—that injured both the decedent and his beneficiaries. *Id.* at 699–701. The court noted that "[a]ttorneys ought not to be bound to assure their clients' intentions but, instead, should be required to perform the task contracted for in a reasonably prudent manner." *Id.* at 701; *see also* KRPC 7.1(b) (prohibits attorneys from communication which creates an unjustified expectation about the results they can achieve); MRPC Rule 7.1(b) (prohibits attorneys from guaranteeing the outcome of her or her representation).

8

by this and the prior lawsuits—adverse to Plaintiffs' interests and contrary to their expectations.

Plaintiffs also contend there was no adversity because Arensdorf's malpractice undermined Douglas's true intent. That may have been what Douglas told Plaintiffs, Junelle, and/or Arensdorf. But he had no will to that effect and no instrument giving Plaintiffs any enforceable rights in or title to the property.[6] And, most importantly, the simple, one-page Assignment that Douglas signed while he was still alive contradicts the intent Plaintiffs described. With respect to determining a decedent's intent, the law favors written instruments over oral statements, especially when it pertains to devising property interests. *See* 9 Williston on Contracts § 25:4 *Contract to devise by will* (4th ed.). Kansas law—like the law in most states—precludes reliance on supposed intent that contradicts an unambiguous written document. *See In re Marriage of Nelson*, 475 P.3d 1284, 1289 (2020) (parol evidence rule requires determining parties' intent from the document's four corners where unambiguous without additional construction rules). Indeed, Kansas law presumes that a written document will be the final expression of the individual's intent and that the individual signing the document both knows of its contents and agrees to be bound it its terms. *See*, *e.g.*, *Albers v. Nelson*, 809 P.2d 1194, 1197 (Kan. 1991).

The adversity in this transaction distinguishes the authorities on which Plaintiffs rely. For example, in *Jeanes v. Bank of Am., N.A.*, 295 P.3d 1045 (Kan. 2013), the Kansas Supreme Court held that a malpractice claim relating to the preparation of an *inter vivos* revocable trust (designed to pass assets to Janet Jeanes) accrued in favor of Jeanes (and not the Estate's representative) because the malpractice at issue—

---

[6] Douglas died intestate. The prenuptial agreement does not change that result. *Contra* Doc. 31 at 13 (arguing that the prenuptial agreement "served to pass the [property interest] to Plaintiffs"). Indeed, the prenuptial agreement, which generally serves to separate property when a marriage dissolves, *see* 5 Williston on Contracts, *Agreements between husband and wife; premarital agreements* § 11:8 (4th ed.), neither mentions Plaintiffs by name nor purports to be a will. *See* Doc. 21-2 (prenuptial agreement); Kan. Stat. Ann. § 59-606 (requires a will to be signed and be in writing). Rather, the prenuptial agreement uses the antiquated language of "heirs, assigns or devisees and legatees," which Kansas law confirms means Plaintiffs' interests would not be ascertainable until Douglas's death. *Cf. Peterson v. Peterson*, 251 P.2d 221, 224 (Kan. 1952) (heirs' interests vest upon decedent's death); *Wilson-Cunningham v. Meyer*, 820 P.2d 725, 729 (Kan. Ct. App. 1991) (noting that any property settlement with decedent's wife from the divorce would incidentally affect anything he would pass through intestate succession). Even if Douglas intended to use the prenuptial agreement as an estate-planning device, which it is not entirely clear from the Second Amended Complaint, that prenuptial agreement did not bind or preclude Douglas from later devising his property in a way inconsistent with his previously ascribed intentions.

increased tax liability caused by inept estate planning—did not accrue until after the donor's death. 295 P.3d at 1045. And in *Pizel*, the Kansas Supreme Court held that the intended beneficiaries of an *inter vivos* trust could sue the attorney who failed to create a valid and enforceable trust. 795 P.2d at 51. In both cases, the court permitted the cause of action because the plaintiffs were the designated beneficiaries expressed in the very instrument the lawyer created.

Plaintiffs' relations to the legal services here are materially different. Unlike in *Jeanes* and *Pizel*, the Assignment Arensdorf prepared did not purport to benefit Plaintiffs nor did it even mention them by name. Rather, it transferred title to Douglas's property into a Trust that—as Plaintiffs acknowledged at the hearing—could have been administered in such a way that Plaintiffs would receive no beneficial interests in the property.

Plaintiffs, nonetheless, argue that they should be able to pursue a claim against Arensdorf because *Jeanes* would permit Arensdorf's malpractice to go unpunished. Doc. 31 at 11–12. That conclusion is not necessarily true, nor even if true, does it compel a different result.

There is a good argument that *Jeanes* would not preclude Douglas's Estate—as opposed to Plaintiffs in their individual capacity—from bringing this claim against Arensdorf. In *Jeanes*, the legal malpractice at issue concerned avoiding estate tax liability that, by definition, could not cause any injury (and therefore not accrue) until after the decedent passed. *Jeanes*, 295 P.3d at 1045. But the malpractice here is different: Arensdorf's alleged misconduct towards Douglas and the property transfer occurred before Douglas passed. Docs. 21 at ¶¶ 34–41; 27-1. Because the transaction immediately transferred title from Douglas to the (revocable) Trust, there appears no reason why Douglas could not have immediately taken action to undo that transaction and/or sued Arensdorf for causing it. As a result, it is not entirely obvious that *Jeanes* would bar the Estate's claim against Arensdorf.

Even if it did, that does not create a cause of action in favor of Plaintiffs. Plaintiffs have not identified any Kansas authority suggesting an estate's inability to bring a malpractice claim automatically creates a cause of action on behalf of a decedent's children. Plaintiffs may believe it would be good policy to reconsider *Jeanes* or for Kansas to recognize a cause of action in favor of the Estate in this circumstance. Indeed, it appears that other states would permit such liability. *See*, *e.g.*, *Belt v. Oppenheimer, Blend, Harrison & Tate*, 192 S.W.3d 780 (Tex. 2006) (holding that decedent's attorneys owed a duty to the estate's personal representatives for legal malpractice because the negligence occurred

before decedent's death and, therefore, the cause of action survived after it). But a federal court may not question the wisdom of Kansas's substantive law nor create a cause of action where existing law does not appear to support it. *Cf. Chieftain Royalty Co. v. Enervest Energy Institutional Fund XIII-A, L.P.*, 888 F.3d 455, 460 (10th Cir. 2017) (citing *Byrd v. Blue Ridge Rural Elec. Co-op.*, 356 U.S. 525, 535 (1958)) (noting that federal courts in diversity cases must respect state-created rights).

**2.** While the first *Wiegers* step alone resolves this dispute, both the second and third steps also cut in favor of Arensdorf.

**a.** In this case at least, the second step is simply the inverse of the first. Just as there is adversity between Douglas's conduct and Plaintiffs' interests, the facts alleged reject the notion that Douglas (or Arensdorf) intended the Assignment to benefit Plaintiffs. Prior to Douglas's Assignment execution, Plaintiffs had no legal right or title to the property at issue. The Assignment transferred Douglas's property in a way that diluted, if not entirely eliminated, their potential interest in the property. But Plaintiffs allege that absent that Assignment (or any other devise by Douglas), they would have received the property in full through intestate succession as Douglas's sole heirs because the prenuptial agreement between Douglas and Junelle prevented Junelle from inheriting any of Douglas's property. Doc. 21 at ¶¶ 8–9, 22. There is, therefore, no way to suggest that Arensdorf's preparation and Douglas's execution of the Assignment was intended to benefit Plaintiffs. As a result, Plaintiffs cannot maintain a claim against Arensdorf. *See also Wilson–Cunningham v. Meyer*, 820 P.2d 725, 730 (Kan. Ct. App. 1991) (noting that it would have been appropriate to deny the attorney's liability to his client's children "solely on the basis that the legal representation . . . was not intended to benefit [the decedent's] children.").

**b.** Likewise, the balance of the six *Pizel* factors tilts against recognizing a duty to Plaintiffs. The six *Pizel* factors weigh (i) the extent to which the transaction was intended to benefit Plaintiffs, (ii) foreseeability of harm to Plaintiffs, (iii) degree of certainty that Plaintiffs suffered injury, (iv) closeness of the connection between Arensdorf's conduct and the injury, (v) policy of preventing future harm, and (vi) burden on the profession to recognize liability under the circumstances. *Pizel*, 795 P.2d at 51. "[A]ll six [*Pizel*] factors must be considered and none can be deemed conclusive." *Wiegers*, 46 P.3d at 567 (internal citations omitted).

All but the final factor favor Arensdorf. The first inquiry is whether the transaction was intended to benefit Plaintiffs. As noted, it was not.

11

And, as a result, the second, third, and fourth factors weigh in Arensdorf's favor because Plaintiffs had no enforceable interests in the property before Douglas's death. While living, Douglas could have devised the property at any time to anyone he wished. Similarly, permitting Plaintiffs to assert a claim would not further the policy of preventing harm. To the contrary, it would place attorneys in the untenable position of zealously representing their client's interests with a fear that potential intestate succession beneficiaries may claim that one or more transactions worked to their detriment.[7] *Cf. Wilson-Cunningham*, 820 P.2d at 729 ("Allowing individuals to whom there was no foreseeable risk of harm to bring an action for negligence would not prevent future harm to individuals to whom there is a foreseeable risk for negligent representation."); *Nevin v. Union Trust Co.*, 726 A.2d 694 (Me. 1999) (explaining that allowing beneficiaries to sue decedent's attorney for legal malpractice for estate planning could affect attorney's judgment where there are potentially conflicting interests).

Plaintiffs have a stronger argument for the sixth factor, which considers the burden of liability on the profession. Docs. 31 at 15; 21 at ¶ 68. Arensdorf undertook a host of activities that implicate real estate law, estate planning, and other tasks that lawyers typically handle due to their specialized training and skill—without consulting or suggesting that Douglas consult with an attorney. Doc. 21 at ¶ 31. Discouraging that conduct would certainly benefit the legal profession and insulate other accountants from similar mistakes. *See, e.g.*, *Pizel*, 795 P.2d at 51 (legal profession not unduly burdened by requiring lawyers to act in a reasonably competent manner when representing clients); *id.* at 49 (noting the *Biakanja* court evaluated defendant notary's moral blame instead of the liability burden on the profession since he was not an attorney) (citing *Biakanja v. Irving*, 320 P.2d 16 (Cal. 1958)).

Yet the balance of those factors strongly favors Arensdorf. Plaintiffs have not alleged that Arensdorf owed them a duty under Kansas law separate from the duty he owed their father. As a result, their legal malpractice claim must be dismissed.

---

[7] This case might have had a different result if Plaintiffs were identified as intended beneficiaries in a written instrument. *See Pizel*, 795 P.2d at 51 (intended beneficiaries would have had no other avenue to recover if not allowed to pursue a negligence claim against attorneys who negligently drafted trust); *Biakanja v. Irving*, 320 P.2d 16 (Cal. 1958) (intended beneficiary should have a cause of action against notary who drafted and executed decedent's will).

**B**

Plaintiffs also contend that Arensdorf violated the KCPA by engaging in the unlicensed or unauthorized practice of law. Doc. 21 at ¶¶ 71–75 (citing Kan. Stat. Ann. § 50-6,142). That claim is not actionable because, as Arensdorf argues, Plaintiffs were not "aggrieved" by Arensdorf's conduct.

Generally speaking, the KCPA protects consumers from suppliers who commit deceptive and unconscionable practices. Kan. Stat. Ann. §§ 50-623(b), 50-627(a). Recently, the KCPA was amended to include the unlicensed or unauthorized practice of law as one type of prohibited practice. *Id.* § 50-6,142(a). It permits "an individual[] . . . aggrieved by a violation" to recover from the unauthorized person who practiced law, "whether or not [the violation] involves a consumer, a consumer transaction, or a supplier." *Id.* §§ 50-6,142(b), (c)(3), 50-634(b).

The statutory term "aggrieved" has a settled meaning under Kansas law. *Hernandez v. Pistotnik*, 472 P.3d 110, 116 (Kan. Ct. App. 2020), *rev. denied* (Nov. 24, 2020). Thus, a KCPA plaintiff must demonstrate that the defendant's act adversely affected their legal rights and a causal connection exists between the deceptive act or practice and claimed injury. *Finstad v. Washburn University*, 845 P.2d 685, 688–89 (Kan. 1993) (finding no causal connection where enrolled students were unaware the deceptive advertising statements had been made about the school or had enrolled before they were published); *Schneider v. Liberty Asset Mgmt.*, 251 P.3d 666, 671 (2011) (finding no causal connection between plaintiff's harm and a deceptive MLS listing because plaintiff's harm resulted from "her failure to read her inspector's report or [from] her decision to buy the house even though she had information the roof was not new").

That settled statutory meaning precludes Plaintiffs' claim that they were aggrieved. As discussed in Part II.A, *supra*, Plaintiffs had no enforceable rights in the property that the Assignment harmed, did not engage Arensdorf to provide legal services, did not rely on his legal skill or services, and were not designated as beneficiaries of the services Arensdorf provided their father.

Nor do Plaintiffs expressly argue that they were "aggrieved" for purposes of the KCPA. Rather, they allege they were aggrieved in the more colloquial sense: that "[Arensdorf's] unauthorized practice of law caused their frail father to take steps he did not want to take" and that the result caused them significant pecuniary loss. Doc. 31 at 17. That

13

will not do, given the way Kansas courts have defined and applied the term "aggrieved." *See, e.g., Hernandez*, 472 P.3d at 117.

Plaintiffs instead seek to recover from Arensdorf under a third-party beneficiary theory. That theory does not appear viable under existing Kansas law. While the parties concede that it appears no Kansas Supreme Court decision has ever considered the viability of a third-party beneficiary claim under the KCPA, the Kansas Court of Appeals recently rejected such a claim due to the absence of reliance. *See Hernandez*, 472 P.3d at 117 (finding no causation where plaintiff failed to show the attorney made a representation to her directly or to her father indirectly, who was acting as her third-party agent, and failed to show that she or her father relied on those statements); *see also Ellibee v. Aramark Corr. Servs., Inc.*, 154 P.3d 39, 41 (Kan. Ct. App. 2007) (finding no causation absent evidence that defendant food service contractor made any representation directly to inmate plaintiff); *Luttrell v. Brannon*, No. 17-2137, 2018 WL 3032993, at *14 (D. Kan. June 19, 2018) (applying *Ellibee* and finding that third-party beneficiary plaintiff did not sufficiently allege defendant made any sales representations to him directly). Plaintiffs have provided no authority suggesting the outcome should be any different here.

Plaintiffs' KCPA claim fails for largely the same reason as their legal malpractice claim. Plaintiffs argued in their brief, Doc. 31 at 17, and at the May 25, 2021, hearing that *Finstad* merely requires establishing a connection between the act that violated the KCPA and the plaintiff's loss to show causation. That may be true, but their situation is indistinguishable from *Finstad* in this regard. Like the unaggrieved *Finstad* plaintiffs, who could not show they had relied on a misleading advertisement about the school before enrolling at it, *see Finstad*, 845 P.2d at 692, Plaintiffs have not shown that Arensdorf wronged them directly. Arensdorf's unauthorized practice of law aggrieved Douglas, not Plaintiffs. Douglas, not Plaintiffs, relied on Arensdorf to provide the legal services. Without alleging that Arensdorf made a representation on which they relied, the Complaint fails to connect how Arensdorf injured Plaintiffs. *Hernandez*, 472 P.3d at 117.

### III

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. 26) is GRANTED.

It is so ordered.

Date: June 9, 2021                             s/ Toby Crouse
                                              Toby Crouse
                                              United States District Judge